AUSA:   Andrew Lievense          Telephone:  (313) 226-9665
Special Agent:   Alexandra Gormely, HHS-OIG   Telephone:(313) 480-4239

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America

v.

AMRO SHARAFELDIN

Case No.

Case: 2:24−mj−30238
Assigned To : Unassigned
Assign. Date : 6/21/2024
Description: RE: SEALED MATTER
(EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2/1/2023 through 3/31/2023_____ in the county of _____MACOMB_____ in the
_____EASTERN_____ District of _____MICHIGAN_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b)(2)(A) | Anti-Kickback Statute |
| 42 U.S.C. § 1320a-7b(b)(4) | Purchase of Medicare Beneficiary Information |

This criminal complaint is based on these facts:

SEE AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent ALEXANDRA GORMELY, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____June 21, 2024_____

_____
*Judge's signature*

City and state:  Detroit, Michigan

Hon. David R. Grand, United States Magistrate Judge
*Printed name and title*

## Affidavit in Support of Complaint

The undersigned, Alexandra Gormely, being duly sworn, hereby deposes and states as follows:

## Introduction and Agent Background

1.      I am a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), assigned to the Detroit, Michigan, field office. I have been employed by HHS-OIG as a Special Agent since August 2022. During my employment with HHS-OIG, my duties and responsibilities as a Special Agent have included conducting criminal investigations of individuals, organizations, and businesses that have violated federal laws, including but not limited to Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 42 U.S.C. § 1320a-7b(b)(4) (Purchase of Medicare Beneficiary Information).

2.      This affidavit is made in support of a criminal complaint and arrest warrant charging AMRO SHARAFELDIN with two offenses: (1) knowingly and willfully combining, conspiring, confederating, and agreeing with others to commit an offense against the United States, that is to knowingly and willfully pay and offer to pay remuneration, by kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), and (2)

knowingly and willfully, purchasing, selling, distributing, and arranging for the purchase, sale, and distribution of beneficiary identification numbers without lawful authority under Title 42, United States Code, Chapter 7, subsection XVIII, that is, Health Insurance Claim Numbers and Medicare Beneficiary Identifier numbers, in violation of 42 U.S.C. § 1320a-7b(b)(4).

3.     This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant; therefore, this affidavit does not contain every fact that I have learned during the investigation. I have only set forth the facts necessary to establish probable cause to believe that AMRO SHARAFELDIN, the then-owner of a pharmacy in Michigan, violated the above-identified statutes. The information contained in this affidavit is based upon my personal knowledge, training, and experience, as well as the combined knowledge, training, and experience of other law enforcement officers and agents with whom I have worked with on this case.

## **The Relevant Statutes**

4.     The elements of a charge of offering or paying health care kickbacks is as follows:

    a. The defendant offered or paid any remuneration (including any kickback, bribe, or rebate) directly or indirectly, openly or secretly, in cash or in kind;

    b.  The payment (or offer) asked for or received was made to a person to induce that person to do one of the following:

        i.  to refer an individual to a person for the furnishing or arranging for the furnishing of an item or service that could be paid for, in whole or in part, by a Federal health care program;

        ii.  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering, any good, facility, service, or item that could be paid for, in whole or in part, by a federal health care program.

    c.  The defendant did so knowingly and willfully.

5.    The elements of a charge for the illegal purchase of Medicare beneficiary information are as follows:

    a.  The defendant purchased or arranged for the purchase of beneficiary numbers under Title 42, U.S. Code, Chapter 7, that is Health Insurance Claim Numbers and Medicare Beneficiary Identifier numbers;

    b.  The defendant lacked lawful authority;

    c.  The defendant did so knowingly and willfully.

3

## Defendant and Prestige Specialty Pharmacy

6.     AMRO SHARAFELDIN (DoB: XX/XX/1984) is a resident of Southeast Michigan,[1] and was the owner of Prestige Specialty Pharmacy, LLC, which did business as Prestige Specialty Pharmacy ("Prestige") in Sterling Heights, Michigan, beginning in or around 2018 and continuing through about July 2023.

7.     According to Prestige's 2020 Annual Statement filed with the Michigan Department of Licensing and Regulatory Affairs, SHARAFELDIN self-reported his title as "CEO/President" on May 21, 2020. According to Prestige's 2021 and 2022 Annual Statements filed with the Michigan Department of Licensing and Regulatory Affairs SHARAFELDIN self-reported his title as "Member" on November 22, 2021. SHARAFELDIN was named as Prestige's resident agent and the registered office address was listed as 3739 15 Mile Road, Sterling Heights, Michigan. Corporate records reflect that on August 18, 2023, Prestige's registered agent was changed to an individual with initials P.C. On October 6, 2023, SHARAFELDIN filed a Certificate of Dissolution to dissolve Prestige Specialty Pharmacy, LLC with the Michigan Department of Licensing and Regulatory Affairs.

## The Medicare Program

8.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or

---

[1] Based on this investigation, SHARAFELDIN recently has resided at several addresses in Wayne and Oakland Counties, but his current address is unknown.

disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

9.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b). Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). At all relevant times, Medicare Part B provided supplementary medical insurance benefits that covered certain doctors' services, outpatient care, preventive services, and medical supplies. This investigation involves Medicare Part B, specifically, over the counter ("OTC" i.e., not prescribed or ordered by a physician) Covid-19 test kits paid for by Medicare.

10.    CMS contracts with regional contractors to process and pay Medicare claims. Wisconsin Physicians Service Government Health Administrators was the Medicare contractor that processed and paid claims involving Part B services provided in Michigan during the relevant period.

11.    Upon certification, health care providers, including clinics, physicians, and pharmacies (collectively, "providers") that provide services to Medicare beneficiaries apply for a Medicare Provider Identification Number ("PIN") for billing purposes. In their enrollment application, providers are required to disclose to Medicare any person or company who holds an ownership interest of 5% or more

or who has managing control of the provider. A provider who is assigned a Medicare PIN and provides services to beneficiaries can submit claims for reimbursement to the Medicare contractor/carrier that includes the PIN assigned to that provider.

12.     A Medicare claim is required to set forth, among other things, the beneficiary's name, address, date of birth, social security number, Medicare Beneficiary Identification number, the date the services are provided, the cost of the services provided, and the name and identification number of the physician or other provider who had ordered the services.

13.     Enrolled Medicare providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement, and, furthermore, certify that they will not knowingly present, or cause to be presented, false and fraudulent claims. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

14.     Medicare further requires providers to certify that they understand that a payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare does not pay claims procured through kickbacks and bribes.

15.     To receive reimbursement for a covered service from Medicare, a provider must have submitted a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

### **Sharafeldin's Status with Medicare**

16.     In March 2023, I reviewed the Medicare Electronic Data Interchange (EDI) Provider Transaction Agreements for Prestige. The Medicare EDI Provider Transaction Agreement is an Agreement that notifies the appropriate Medicare contractor of the provider's consent to participate in Electronic Data Interchange. SHARAFELDIN electronically signed Prestige's Medicare EDI Provider Transaction Agreements on September 23, 2020 with a title of "CEO" and on February 9, 2023 with a title of "Member." No other representatives on Prestige's behalf were listed. By signing this Agreement, the provider and SHARAFELDIN agreed to several conditions, including but not limited to:

  a.  That it will be responsible for all Medicare transactions submitted to CMS by the provider, its employees, or its business associates;

  b.  That it will submit claims only on behalf of those Medicare beneficiaries who have given their written permission to do so, and to certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, are on file;

  c.  That it will submit claims that are accurate, complete, and truthful;

  d.  That all claims will be paid from federal funds, that the submission of such claims is a claim for payment under the Medicare, and that anyone who misrepresents or falsifies, or causes to be misrepresented or falsified, any record or other information relating to that claim that is

required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable federal law.

17.     According to Prestige's Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), in early 2023 Prestige's tax identification number was listed as XX-XXX0606 and its mailing address was listed as 3739 15 Mile Road, Sterling Heights, Michigan. Prestige's National Provider Identifier was listed as 1306340955 and had been active since January 2, 2018. SHARAFELDIN was listed as the "Director," "Authorized Official," "5% or Greater Direct/Indirect Owner," and "Managing Employee" for Prestige's PECOS since January 2, 2018.

18.     SHARAFELDIN updated and verified Prestige's PECOS information on March 14, 2023, keeping himself listed as the "Director," "Authorized Official," "5% or Greater Direct/Indirect Owner," and "Managing Employee." No other representatives on Prestige's behalf were listed to have any Individual Ownership Interest and/or Managing Control Information. SHARAFELDIN was the only individual listed as the "Contact Person."

19.     In July 2023, I reviewed the Medicare Participating Physician or Supplier Agreement for Prestige. Prestige was listed as the participant, with an address of 3739 15 Mile Road, Sterling Heights, Michigan, and a National Provider Identifier of 1306340955. The Medicare Participating Physician or Supplier Agreement was signed by SHARAFELDIN with a title of "Authorized

Representative" on December 1, 2018. No other representatives of Prestige were listed.

20.     On the two most recent Medicare Enrollment Applications, form CMS-855b, submitted on 01/30/2023 and 03/15/2023, SHARAFELDIN self-reported himself to be the "Authorized Signer," "Enrollment Application Contact Person," "Electronic Funds Transfer (EFT) Contact Person," and the only name representing Prestige under the Ownership Interest & Managing Control Info (Individuals) section. SHARAFELDIN self-reported himself to be the "Director," "Authorized Official," "5% or Greater Direct/Indirect Owner," and "Managing Employee" for Prestige, with no other names listed of other individuals. SHARAFELDIN was the only individual listed on these CMS-855b Enrollment Applications for Prestige.

21.     Based on these documents, Prestige was enrolled as a pharmaceutical provider with Medicare Part B and was able to submit claims to Medicare Part B for "over the counter" ("OTC") Covid-19 test kits.

### The Medicare Over-The-Counter Covid-19 Test Kit Program

22.     From April 4, 2022, to May 11, 2023, while the Covid-19 public health emergency was in effect, Medicare covered and paid for up to eight OTC Covid-19 test kits per month for people with Medicare Part B who requested them under the terms of the Over-the-Counter Covid-19 Test Demonstration. Correspondingly, providers, including Prestige, could provide and bill Medicare for the requested OTC Covid-19 test kits if the beneficiary requested the test kit. (Over-the-Counter

COVID-19 Test Demonstration, https://www.cms.gov/files/document/over-counter-covid-19-test-demonstration.pdf.)

## Probable Cause as to Sharafeldin

23.     As set forth below, SHARAFELDIN knowingly and willfully paid kickbacks and bribes, and purchased Medicare Beneficiary Identifier numbers, that he then unlawfully used to submit or cause to submit false and fraudulent claims on behalf of Prestige to Medicare for the provision or purported provision of OTC Covid-19 test kits, in violation of Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 42 U.S.C. § 1320a-7b(b)(4) (Purchase of Medicare Beneficiary Information). The submission of claims caused Medicare to pay Prestige, which was owned and/or controlled by SHARAFELDIN. SHARAFELDIN submitted or caused to be submitted more than $1 million in false and fraudulent claims to Medicare for the provision or purported provision of Covid-19 test kits.

24.     In 2023, I initiated a criminal investigation into Prestige and SHARAFELDIN based on allegations that Prestige and SHARAFELDIN engaged in a scheme and artifice to defraud the Medicare Program by submitting or causing the submission of fraudulent claims for the provision or purported provision of OTC Covid-19 test kits to Medicare beneficiaries through the mail.

**Hotline Complaints and Data**

25.     Over three days (February 24, 2023, February 27, 2023, and March 9, 2023), Prestige submitted Medicare claims using the billing code for OTC Covid-19 test kits and received Medicare payments in the following approximate amounts:

| Date of Claim | Number of Claims | Amount Billed | Amount Paid |
|---|---|---|---|
| February 24, 2023 | 2,929 | $281,184.00 | $273,772.80 |
| February 27, 2023 | 3,964 | $380,544.00 | $370,016.64 |
| March 9, 2023 | 3,930 | $377,280.00 | $367,288.32 |
| **TOTAL** | **10,823** | **$1,039,008.00** | **$1,011,077.76** |

26.     All of Prestige's 10,823 claims were submitted to and paid by the Medicare contractors responsible for administering Medicare Part B.

27.     Of the 10,823 Medicare claims submitted by Prestige, at least 21 claims for at least $2,016 were for Medicare beneficiaries who were dead on or before the date of claim for the OTC Covid-19 test kit billing code.

28.     Then, beginning in March 2023, the HHS-OIG Hotline received complaints from Medicare beneficiaries stating Prestige sent Covid-19 test kits to beneficiaries that the beneficiaries did not request or want, and therefore the beneficiaries believed the provision of the kits (and therefore the billings) were fraudulent. Alternatively, some beneficiaries reported Prestige billed their Medicare accounts for Covid-19 test kits but that they never received the kits. Some beneficiaries stated in the Hotline complaints that they did not give their Medicare number or personal information to anyone over the phone or online. Some

beneficiaries reported receiving multiple packages of Covid-19 test kits in the mail in recent months from different companies, without requesting or wanting them.

**Witness Interviews**

29.    Agents interviewed several individuals whose Medicare beneficiary information was used by Prestige to bill for Covid-19 test kits. A short summary of some of those interviews follows.

30.    On March 13, 2023, I interviewed D.G., a Medicare beneficiary residing in Saint Clair Shores, Michigan. D.G. reported that in March 2023, he received eight rapid antigen Covid-19 test kits in the mail from Prestige. D.G. never requested any of the tests. D.G. related he had never heard of Prestige. D.G. showed the eight Covid-19 test kits to Agents during the interview. Records revealed that on or about February 27, 2023, Prestige submitted or caused to be submitted a claim to Medicare for eight Covid-19 test kits to a Medicare beneficiary with the initials D.G., for which Medicare reimbursed Prestige about $94.

31.    On March 13, 2023, I interviewed S.S., a Medicare beneficiary residing in Saint Clair Shores, Michigan. S.S. reported that in March 2023, she received eight rapid antigen Covid-19 test kits in the mail from Prestige. She stated she never requested any of these tests. S.S. stated she has no knowledge of Prestige. S.S. related she had recently received several Covid-19 test kits in the mail that she did not need or order.  Records revealed that on or about February 27, 2023, Prestige submitted or caused to be submitted a claim to Medicare for eight Covid-19 test kits

to a Medicare beneficiary with the initials S.S., for which Medicare reimbursed Prestige about $94.

32.     On February 21, 2024, I interviewed W.L., a Medicare beneficiary residing in San Angelo, Texas. W.L. reported that in March 2023, eight Covid-19 test kits from Prestige were billed to his Medicare, however W.L. never received them. W.L. never requested any of these Covid-19 test kits that he was billed for. W.L. had never heard of Prestige. W.L. had no providers or pharmacies in Michigan. Records revealed that on or about February 27, 2023, Prestige submitted or caused to be submitted a claim to Medicare for eight Covid-19 test kits to a Medicare beneficiary with the initials W.L., for which Medicare reimbursed Prestige about $94.

**Conversations with Prestige Employee, Sharafeldin, and J.B.**

33.     On April 12, 2023, I spoke to a staff pharmacist, Saher (Last Name Unknown), at Prestige. Saher stated the owner of Prestige was SHARAFELDIN and that SHARAFELDIN was not at the pharmacy. Saher was the only pharmacist working at Prestige on this date and only gave SHARAFELDIN's name when asked by Agents who was the owner of Prestige.

34.     On April 12, 2023, I conducted a telephonic interview of SHARAFELDIN and an individual with initials J.B. During the interview, SHARAFELDIN referred to J.B. as his "Managing Partner," and I am otherwise aware that J.B. became involved with Prestige at some unknown time. J.B. explained

13

Prestige contracted with a marketing firm for the "Covid initiative," paying the firm to procure Medicare beneficiary leads. J.B. stated Prestige had received phone calls from Medicare beneficiaries complaining about receiving the test kits from Prestige. J.B. and SHARAFELDIN claimed that Prestige bought the Covid-19 test kits and sent them to Medicare beneficiaries whose information Prestige obtained through the marketing firm. SHARAFELDIN stated Prestige purchased the Covid-19 test kits from Phase Scientific and had invoices to correspond with them. SHARAFELDIN stated he was selling the pharmacy because he was going to retire. SHARAFELDIN stated he had been in contact with the Medicare contractor about providing records regarding the Covid-19 test kits.

**Additional Complaints**

35.    CoventBridge Group is the Medicare unified program integrity contractor covering Michigan, responsible for performing investigations and audits to protect Medicare from fraud, waste, and abuse. In March 2023, CoventBridge Group began an investigation into Prestige based on beneficiary complaints it received stating Medicare beneficiaries were sent at-home Covid-19 tests that were not ordered or requested.

36.    CoventBridge interviewed Medicare beneficiaries and learned beneficiaries received Covid-19 test kits from Prestige they did not request or want, and learned Prestige billed Medicare on dates after the beneficiaries had died.

37.     At one point, CoventBridge had received 420 beneficiary complaints against Prestige, 110 from beneficiaries who did not receive the OTC Covid-19 test kits, 154 from beneficiaries who had not heard of Prestige, 136 listed as "other," and 15 listed as suspected identity theft.

38.     Separately, Medicare beneficiaries filed complaints against Prestige with the Medicare Benefit Integrity Unit (BIU), a program integrity unit responsible for preventing, detecting, and deterring Medicare fraud, which, among other things, receives and catalogs complaints called into the Medicare Fraud Hotline. Between March 2, 2023, and February 23, 2024, there were a total of 690 complaints against Prestige. The allegations in the complaints were consistent with the information from the beneficiary interviews and HHS-OIG Hotline complaints and were from beneficiaries throughout the United States, not just Michigan.

**Prestige's Contracts and SHARAFELDIN'S Text Messages**

39.     Later, agents learned that in early 2023 Prestige had entered contracts with three Florida-based companies related to Prestige's provision of Covid-19 test kits. Under those contracts, one company ("Company A") was to provide lists of Medicare beneficiaries' identifying information for Prestige to provide Covid-19 test kits to the beneficiaries and bill Medicare for the kits. Another company ("Company B") was to store, manage, and ship the Covid-19 test kits. And another company ("Company C") was to provide "consulting services" to facilitate the distribution of the Covid-19 test kits. Based on the investigation, Company A, B, and C's owners

15

and/or management had pre-existing business relationships with each other, and SHARAFELDIN had a pre-existing unknown business relationship with K.W., one of the owners/managers of Company C.

40.     Under the contract with Company A, Prestige received from Company A lists of identifying information for Medicare beneficiaries for Prestige to provide and bill Medicare for Covid-19 test kits. In other words, this contract was for the purchase of Medicare Beneficiary Identifier numbers. Also, I have reviewed interview reports, including from cooperating individuals, that indicate Prestige was required to pay a set amount per Medicare Beneficiary Identifier number, which was remuneration that was based on the volume of beneficiaries provided in violation of the Anti-Kickback Statute.

41.     Under the contract with Company B, Prestige agreed to pay Company B to provide and ship the Covid-19 test kits to Medicare beneficiaries whose identifying information had been provided to Prestige by Company A.

42.     Under the contract with Company C, Prestige agreed to pay Company C for "consulting services," which included submitting claims in the beneficiaries' names to Medicare for the Covid-19 test kits. Prestige was required to pay a set amount, $24, per order filled by Company B, which was remuneration that was based on the volume of referrals in violation of the Anti-Kickback Statute.

43.     I also received and reviewed information from the cell phone of P.F., the owner of Company A, and information from the cell phone of K.W., an

owner/manager of Company C. The phones were lawfully searched by federal law enforcement agents in conjunction with a federal criminal investigation conducted on Company A and Company C in Florida. The phones contained text messages (via WhatsApp), emails, and other communications with SHARAFELDIN and others associated with Prestige that were, based on the context, about Prestige's involvement with Company A, B, and C and the OTC Covid-19 test kits.

44.    For example, on January 31, 2023, K.W. and SHARAFELDIN had the following text message exchange via WhatsApp on K.W.'s cell phone:

    a.  K.W.: What's your billing software

    b.  SHARAFELDIN: Pioneer.

45.    I know that PioneerRx is a pharmacy billing software.

46.    On the next day, February 1, 2023, K.W. sent a message via WhatsApp to SHARAFELDIN stating "I'm getting all the information updated. How many do you want to do a week? You can do up to 15,000."

47.    In response, SHARAFELDIN texted "Mm," "Your call," and "Safetyyy."

48.    K.W. and SHARAFELDIN continued the conversation via text, with K.W. saying that SHARAFELDIN "might as well go all in," to which SHARAFELDIN responded "Ok" and "Do it."

49.    Then, on February 9, 2023, another owner/manager of Company C, A.S. (also known as C.S.), sent a group message via WhatsApp to SHARAFELDIN,

K.W., and two other contacts asking for "the information in the screenshot above so he can populate it for you in the Cms provider transaction agreement. You can do this yourself if you'd like, please let us know asap. Thank you."

50.    In response, SHARAFELDIN texted "Amro sharafeldin," "member," "2013819255," and also provided "info@pspmichigan.com."

51.    Based on my investigation, SHARAFELDIN is identifying himself as a member of Prestige, providing Prestige's email address, and providing one of his then-phone numbers in his text messages to K.W., A.S., and the other contacts. I know that SHARAFELDIN used the phone number 201-381-9255 because he included it as his personal telephone number in documents he filed with Medicare on behalf of Prestige.

52.    Later on February 9, 2023, A.S. sent a group WhatsApp message to SHARAFELDIN, K.W., and two other contacts with an "update" on the claim submission process. In response, SHARAFELDIN sent two messages: "So all good" and "Eft is already in place." I believe "Eft" is a reference to the "Electronic Funds Transfer" Medicare providers submit, also known as a CMS-588.

53.    Also among the messages on the phones was the screenshot of a Spirit Airlines itinerary for SHARAFELDIN and an individual with initials P.C. (mentioned in paragraph 7 as later becoming Prestige's resident agent in August 2023) to fly from Detroit to Fort Lauderdale in the morning of February 13, 2023, and fly from Fort Lauderdale to Detroit in the evening the same day. Based on

information received from a witness and from text messages, SHARAFELDIN and P.C. met with people associated with Company B and C and visited Company B's facility while in Florida. Furthermore, Spirit Airlines records revealed that SHARAFELDIN and P.C. boarded these flights, which K.W. purchased.

54.     The contract between Prestige and Company C is dated late February 2023, around the time of these messages and SHARAFELDIN's travel to Florida.

55.     I have reviewed a series of WhatsApp messages between and involving SHARAFELDIN and K.W. spanning approximately January 2023 through at least May 2023. In those messages SHARAFELDIN and K.W. discuss a business relationship involving Prestige and Covid-19 test kits.

56.     With respect to Company A and P.F., on February 25, 2023, February 27, 2023, and March 9, 2023, P.F. sent emails to Prestige containing Microsoft Excel spreadsheets of Medicare beneficiary identifying information, to include each beneficiary's name, Medicare number, date of birth, gender, phone number, and address. The Medicare beneficiary information contained in these Excel spreadsheets corresponds to the beneficiaries Prestige billed Medicare for Covid-19 test kits. These Excel spreadsheets were titled "Prestige 2.24.23 – Prestige," "Prestige 2.27.23 – Prestige 2.27.23," "Prestige 2.27.23 2nd – Sheet 1," and "Prestige 3.9.23 – Sheet 1." The dates of these Excel spreadsheets correspond to the three dates Prestige billed Medicare over $1 million for Covid-19 test kits.

57.     Additionally, I found a Company A invoice on P.F.'s cell phone to Prestige for "Flat Rate Marketing $172,500" from "02/15/2023 – 02/28/2023." This timeframe includes the first two days Prestige billed Medicare for Covid-19 test kits and equates to approximately $25/beneficiary. I reviewed interview reports related to the Florida investigation and learned that Company A sold Medicare beneficiary leads to Prestige for a set dollar amount per beneficiary.

58.     Furthermore, when reviewing P.F.'s cell phone, I discovered several emails Prestige sent to P.F. in which Prestige reported that it had received complaints from Medicare beneficiaries who were billed for Covid-19 test kits by Prestige.

59.     I also found WhatsApp group messages from before the last billing date that included SHARAFELDIN, K.W., and P.C. in which the participants discussed the complaints Prestige was receiving from Medicare beneficiaries. K.W. advised telling the callers, among other things, that "we will reverse the charges."

60.     Despite receiving these complaints, Prestige and SHARAFELDIN caused Medicare to be billed more than 3,900 additional times for OTC Covid-19 test kits. Also, based on my investigation, Prestige and SHARAFELDIN never reversed any of the Medicare billings for OTC Covid-19 test kits that they billed or caused to be billed.

### REVIEW OF FINANCIAL RECORDS

61.     As part of this investigation, I obtained and reviewed bank and other financial records of Prestige, SHARAFELDIN, and others, and I consulted with an FBI Forensic Accountant who reviewed the records.

62.     According to these records, in March of 2023, $1,011,011.76 in Medicare funds were transferred into Prestige's Chase Bank account that was on file with Medicare (JPMorgan Chase account #XXXX6292) for the reimbursement for Covid-19 test kits. SHARAFELDIN and an individual with initials S.G., a known associate of SHARAFELDIN, had signature authority for the Chase account ending 6292.

63.     Before Medicare paid Prestige these funds, the Chase account ending 6292 contained $19,489.93.

64.     On March 15, 2023, SHARAFELDIN changed the Prestige bank account on file with Medicare to MI Bank account #XXXX3452. SHARAFELDIN, P.C., and J.B. had signature authority for the MI Bank account ending 3452.

65.     From March 15, 2023, to August 30, 2023, all the funds from the Chase account ending 6292 were transferred out; Chase wrote off the Chase account ending 6292 on August 30, 2023 with $199.99 due to Chase. Based on a review of the Chase records, the initial account balance and the approximately $1 million in Medicare funds related to the Covid-19 test kits were distributed into the following categories:

| Location | Amount |
|---|---|
| SHARAFELDIN - Chase Acct. #XXXXXX0180<br>• Signatory: SHARAFELDIN | $200,000.00 |

| | |
|---|---|
| Prestige Specialty Pharmacy - MI Bank Acct. #XXXX3452<br>    • Signatories: SHARAFELDIN, P.C., and J.B. | $754,568.00 |
| Prestige Specialty Pharmacy - The State Bank Acct. #XXX6961<br>    • Signatory: SHARAFELDIN | $65,000.00 |
| Other Vendors/Entities | $10,933.69 |

66.     Based upon a review of the $754,568.00 transferred to MI Bank account

ending 3452, funds were further disbursed in the following categories:

| Location | Amount |
|---|---|
| J.M. Smith Corp. | $259,000.00 |
| Prestige Specialty Pharmacy – The State Bank (two accounts, including the account ending 6961 mentioned above, controlled by SHARAFELDIN) | $100,608.47 |
| Company A | $100,000.00 |
| J.B. – Citizens Loan #XXXXXX4533 | $100,000.00 |
| Blue Chip Helping Hands | $50,635.00 |
| P.C. – Fifth-Third Bank Acct. #XXXX7992 | $44,152.55 |
| Phase Diagnostics Inc. | $40,969.20 |
| Miscellaneous Vendors/Entities | $57,927.58 |

67.     I know that Smith Drug Company, a division of J.M. Smith Corp.,

invoiced Prestige for prescription and non-prescription medications from about

March to May 2023 in the amount of $259,000.

68.     I know that, in December 2022, J.B. paid Smith Drug $100,000 to be

applied to Prestige's account, which may explain why Prestige paid J.B. $100,000

of the funds. Relatedly, I know that J.B. is the resident agent of Blue Chip Helping

Hands, a Michigan nonprofit company.

69.     Based on the financial records, it does not appear that SHARAFELDIN

or Prestige paid Company B or Company C any money. Only Company A received

the $100,000 from Prestige.

## **CONCLUSION**

70.     I believe probable cause exists that AMRO SHARAFELDIN violated

Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 42 U.S.C. §

1320a-7b(b)(4) (Purchase of Medicare Beneficiary Information).

_____
Special Agent Alexandra Gormely
HHS-Office of the Inspector General

Sworn to before me and signed in my presence
And/or by reliable electronic means.

_____
HON. DAVID R. GRAND
United States Magistrate Judge

Dated:   June 21, 2024